1

2

3

4

5

6

7

8

9 # UNITED STATES DISTRICT COURT

10 ## EASTERN DISTRICT OF CALIFORNIA

11

12 MATTHEW SANCHEZ,                          1:10-CV-00809 AWI SMS HC

13                     Petitioner,           FINDINGS AND RECOMMENDATION
                                             REGARDING PETITION FOR WRIT OF
            v.                               HABEAS CORPUS

14

15 MIKE D. McDONALD, Warden,

16                     Respondent.
   _____/

17

18      Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

19 pursuant to 28 U.S.C. § 2254.

20                              **BACKGROUND**[1]

21      Petitioner is currently in the custody of the California Department of Corrections pursuant

22 to a judgment of the Superior Court of California, County of Fresno, following his conviction by

23 jury trial on April 8, 2008, of first degree murder with the use of a gun.  He was sentenced to

24 serve an indeterminate term of 50 years to life in state prison.

25      Petitioner filed a timely notice of appeal.  On April 16, 2009, the California Court of

26 Appeal, Fifth Appellate District ("Fifth DCA"), affirmed Petitioner's judgment in a reasoned

27 _____

28      [1]This information is derived from the state court records lodged by Respondent with her response and is not
subject to dispute.

1

1  decision.  Petitioner then filed a petition for review in the California Supreme Court.  The

2  petition was summarily denied on June 24, 2009.

3      Petitioner filed several collateral challenges to his conviction in the state courts.  On

4  October 5, 2009, he filed a petition for writ of habeas corpus in the California Supreme Court.

5  The petition was denied on March 18, 2010.  He then filed a petition in the Fifth DCA on

6  October 27, 2009.  The petition was denied on February 3, 2010.  Finally, on February 16, 2010,

7  he filed a petition for review in the California Supreme Court.  The petition was denied on March

8  24, 2010.

9      On May 10, 2010, Petitioner filed the instant federal habeas petition.  He presents the

10  following claims for relief: 1) The evidence was insufficient; 2) The confession was coerced; 3)

11  He received ineffective assistance of trial counsel; 4) He received ineffective assistance of

12  appellate counsel; and 5) The trial court committed instructional error.

13      On August 2, 2010, Respondent filed an answer to the petition.  On August 24, 2010,

14  Petitioner filed a traverse.

15                      **STATEMENT OF FACTS**[2]

16      *Prosecution Case*

17      Shortly after 3:00 a.m. on December 16, 2006,[FN1] [Petitioner] called 911 and, as
    indicated in the transcript of the call that was admitted into evidence, reported the

18  following. His girlfriend had been shot. A white male, followed by a second male, forced
    their way into [Petitioner]'s apartment and "went to the room." At some point thereafter,

19  [Petitioner] "heard this loud pop." The two intruders then "jumped out the window."
    They "looked like some guys [[Petitioner]'s girlfriend] yelled at earlier when [she and

20  [Petitioner]] were coming home."

21      FN1. All references to dates in December are dates in December 2006.

22      At approximately 3:00 a.m. on December 16, a Fresno police officer, responding
    to a report that someone had been shot, went to an apartment in Fresno where he found

23  the body of a woman, later identified as Megan Israelsky, lying on the bed in the
    bedroom. An autopsy later determined Israelsky died of a gunshot wound to the head. A

24  forensic pathologist opined the gun was approximately six inches from the victim's head
    when she was shot.

25      Matthew Padilla testified to the following. He and [Petitioner] are friends. At

26  approximately 7:00 p.m. on December 15, [Petitioner] came over to Padilla's house.

27  —————————

28      [2]The Fifth DCA's summary of the facts in its August 29, 2008, opinion is presumed correct. 28 U.S.C.
    §§ 2254(d)(2), (e)(1). Thus, the Court adopts the factual recitations set forth by the Fifth DCA.

[Petitioner] had his baby daughter with him. He stated he and Israelsky were "always arguing" and "their relationship wasn't that good." [Petitioner] left at approximately 10:00 p.m.

[Petitioner]'s mother testified that [Petitioner] arrived at her home at approximately 10:00 p.m. on December 15. [Petitioner] said he wanted to use the restroom. He stayed for approximately five minutes. [Petitioner]'s father testified that police officers came to his home on the morning of December 16 and that after speaking to them, he discovered that one of his firearms, a semi-automatic handgun, and an ammunition magazine were missing.

Fresno Police Officer Timesa Spencer, in responding to a report of a shooting on December 16 at some point after 3:00 a.m., made contact with [Petitioner], who was carrying an infant child and a diaper bag. [Petitioner] told the officer the following. Two men forced their way into [Petitioner]'s apartment, shortly thereafter, [Petitioner] "heard a pop sound" and saw a "flash," and thought he heard both men jump from the window in the bedroom. Earlier, on December 15, he and Israelsky had been driving when the two men "crossed in front of them," and Israelsky "began yelling at them...."

Officer Brandon Brown arrived on the scene at approximately 3:11 a.m. on December 16. He observed that [Petitioner], who was in the company of two other officers, was having trouble holding a small child in one arm while carrying a diaper bag in the other arm. Concerned that [Petitioner] was going to drop the child, Officer Brown grabbed the bag, and in doing so noticed, at the bottom of the open bag, what appeared to be a firearm and an ammunition magazine. The officer took the bag and put it in a patrol vehicle. [Petitioner] later told another officer that after the intruders left the apartment, he went back in and found a gun underneath Israelsky's body, and that he then put the gun in his child's diaper bag.

Thereafter, Officer Spencer took the baby to a warm car, and Detectives Rodriguez and Fern interviewed [Petitioner] in the area of the apartment building carport. An audio recording of the interview was made, and a transcript of the recording introduced, into evidence, indicated that [Petitioner] told the detectives the following. He and Israelsky "had a confrontation with some people" earlier in the day while driving home. Between 7:30 p.m. and 8:00 p.m., [Petitioner] saw these persons "walking around" in the area of the apartment building. They saw [Petitioner] leave. [Petitioner] "felt like they were going to come and [do] something to [Israelsky]," so he went to his parents' house and "took [his] dad's gun." He wanted the gun "for protection." When he got back home, he loaded the gun while sitting in the car, parked in the carport.

[Petitioner] further told the detectives the following. It was approximately 11:00 p.m. when [Petitioner] arrived home. He fell asleep on the couch. Later, he awakened and went into the bedroom. As Israelsky was "just waking up," [Petitioner] was "showing [the gun] to her," when it accidentally discharged. [Petitioner] did not know the safety was off. [Petitioner] then "got scared" and put the gun in the diaper bag.

Later in the interview, [Petitioner] stated the following. Israelsky was "annoyed" with him that he brought a gun into their home. She had "been annoyed at [him] at the same level many times...." The most recent time he and Israelsky argued, she said, "if you don't like things then you can leave," and "a while back [she] said she wished (inaudible) signed the birth certificate...." "[E]ven farther back she said ... she wished that she never got pregnant because then [she was] stuck with [[Petitioner]]." "[A]ll [that] came flooding back" when, while [Petitioner] was holding the gun, Israelsky made "the same face she made [when] she was disgusted...." He "clinched" the gun, and it went off. The gun did not go off "on [its] own." [Petitioner] "pulled the trigger." When asked if he

3

"regret[ted] shooting her out of anger," [Petitioner] answered, "Yes." [Petitioner] was "just mad for that second."

Later, [Petitioner] spoke with Detectives Richard Byrd and Michele Ochoa, [FN2] and told them he and Israelsky were driving home when Israelsky "yelled at" "some teenagers" who were walking across the street; the teenagers "yelled back," "pulled out a knife," and "threatened [Israelsky]"; and [Petitioner] and Israelsky "drove off...." [Petitioner] saw the teenagers when he was parking the car; "they looked at" [Petitioner] and Israelsky; and "they know where we live now." At approximately 10:00 p.m. that night, [Petitioner] went to his parents' house and, while his father was sleeping, went into the bedroom and took his father's gun and a "clip," "hid" the gun in his pants and left. [Petitioner] took the gun in order to provide protection for Israelsky. Later, while sitting in his car, "getting ready to go into the apartment," he loaded the gun.

> FN2. An audio tape of the interview was made and admitted into evidence. Except as otherwise indicated, the remainder of the "Prosecution Case" portion of our factual statement is taken from the tape of this interview.

Later that night at home, he heard sounds from the bedroom that indicated Israelsky was waking up. He went into the bedroom, turned on the light, "brought [the gun] close to [Israelsky]" and showed it to her, at which point "she had that look on her face like she was disgusted [with] me." [Petitioner] elaborated, "she's made that face when she's even told me like I disgust her or I make her physically ill, she's made that face."

"[B]ack ... months ago," during a "real bad" argument, Israelsky had stated the following: she wished she had not gotten pregnant because as a result of getting pregnant, she was "stuck with [[Petitioner]]." She also wished [Petitioner] had "never signed the birth certificate" and that she had never met [Petitioner].

Four days previously, [Petitioner] said he would go with Israelsky to the store to get some medicine for the baby, but he was very tired and wanted to sleep first. He asked Israelsky to wake him in 30 minutes but "she let [him] sleep four hours instead." The two argued, and Israelsky "got mad and threw the baby's thermometer against the wall...." The "disgusted" look Israelsky gave [Petitioner] "brought everything back, everything back that one second," and [Petitioner] "clinched and pulled the trigger and shot her in the face...."

[Petitioner] knew there was a "safety" on the gun but he "just didn't know it was off."

At one point, [Petitioner] stated he "didn't [shoot Israelsky] on purpose...." Later, however, [Petitioner] denied he said he shot Israelsky "accidentally," and the following exchange occurred:

> "[Detective Byrd]: Okay but the truth is she angered [*sic*] in that moment and you purposely pulled the trigger and shot her because she angered you is that not correct?

> "[Petitioner]: That is correct."

Later, this exchange occurred:

> "[Detective Ochoa]: You made a split second decision and you decided to pull the trigger.

4

1    "[Petitioner]: And it was a real bad decision."

2    Fresno County Deputy Sheriff Coburn Bayer testified to the following. The gun
3    [Petitioner] fired had three "safety features," all of which had to be disengaged in order
     for the gun to fire. If the gun is not cocked, it takes 10 to 14 pounds of pressure to pull the
     trigger and fire the gun. After a round is fired, the gun is cocked, and it takes up to seven
4    pounds of pressure to fire the gun.

5    Ian Wagner and Christina Hougard testified to the following. In December 2006,
     they were living in an apartment in Fresno and [Petitioner] and Israelsky were living in
6    the apartment next door. The two couples were neighbors for approximately two or three
     months. Wagner and Hougard heard [Petitioner] and Israelsky arguing late at night,
7    several times a week.

8    Israelsky gave birth to a child and, Hougard testified, the arguing increased after
     that. Hougard also testified that before the baby was born, [Petitioner] stated Israelsky
9    "gets on his nerves" and "nags him a lot."

10   *Defense Case*

11   [Petitioner] testified that when he and Israelsky were driving home, Israelsky
     yelled at two persons who were "taking their time" crossing the street in front of them.[FN3]
12   One of the men pulled out a knife and [Petitioner] drove off. As a result of this incident,
     [Petitioner] decided to get a gun from his father for protection.
13
     FN3. The "Defense Case" portion of our factual statement is taken entirely from
14   [Petitioner]'s testimony.

15   [Petitioner] got home from his father's house with the gun at some point after
     11:00 p.m. Israelsky was asleep. [Petitioner] slept on the couch in the living room with
16   his daughter for three or four hours and when he awoke, he heard Israelsky "moving
     around." At that point, he walked into the bedroom to show the gun to Israelsky. Israelsky
17   was just waking up. [Petitioner] did not know if the safety was on or if there was a bullet
     in the chamber. He bent down to kiss her on the cheek and as he stood up the gun went
18   off. [Petitioner] did not realize he had shot Israelsky until he turned on the lights
     afterward. Israelsky never gave [Petitioner] "any kind of a look" because [Petitioner]
19   "never showed her the gun."

20   [Petitioner] was not angry. He "told [the police he was] because they made it
     sound that that was the only way they were going to believe [Petitioner]...." The police
21   indicated they thought [Petitioner] "hated" Israelsky and killed her "in cold blood."
     [Petitioner] did not want them to think that, and for that reason, he told them he killed her
22   in a moment of anger. Israelsky did not really say the insulting and abusive things
     [Petitioner] told the police she said. He felt he had to tell the police what he thought they
23   wanted to hear.

24   (See Resp't's Answer Ex. A.)

25                                    **DISCUSSION**

26   I.   Jurisdiction

27   Relief by way of a petition for writ of habeas corpus extends to a person in custody

28   pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

                                             5

or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of Fresno County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct. 1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.     Standard of Review

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63, 70 (2003).  Under the AEDPA, a petitioner can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, quoting 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., quoting Williams, 592 U.S. at 412. "In other

1    words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or

2    principles set forth by the Supreme Court at the time the state court renders its decision." Id.

3            Finally, this Court must consider whether the state court's decision was "contrary to, or

4    involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at

5    72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may

6    grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]

7    Court on a question of law or if the state court decides a case differently than [the] Court has on a

8    set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S.

9    at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the

10    state court identifies the correct governing legal principle from [the] Court's decisions but

11    unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

12            "[A] federal court may not issue the writ simply because the court concludes in its

13    independent judgment that the relevant state court decision applied clearly established federal

14    law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.

15    A federal habeas court making the "unreasonable application" inquiry should ask whether the

16    state court's application of clearly established federal law was "objectively unreasonable." Id. at

17    409.

18             Petitioner has the burden of establishing that the decision of the state court is contrary to

19    or involved an unreasonable application of United States Supreme Court precedent. Baylor v.

20    Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

21    states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

22    state court decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-

23    01 (9th Cir.1999).

24            AEDPA requires that we give considerable deference to state court decisions. "Factual

25    determinations by state courts are presumed correct absent clear and convincing evidence to the

26    contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a

27    factual determination will not be overturned on factual grounds unless objectively unreasonable

28    in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v.

7

1  Cockrell, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254 apply to

2  findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett,

3  393 F.3d 943, 976-77 (2004).

4  III.   Review of Claims

5       A.   Insufficiency of the Evidence

6       In his first ground for relief, Petitioner argues the evidence was insufficient to support his

7  conviction for first degree murder.  He claims he shot the victim by accident.

8       Petitioner presented this claim by habeas petition to the California Supreme Court on

9  October 5, 2009.  The California Supreme Court denied the petition without comment.

10 Normally, when the California Supreme Court's opinion is summary in nature, the Court must

11 "look through" that decision to a court below that has issued a reasoned opinion.  Ylst v.

12 Nunnemaker, 501 U.S. 797, 804-05 & n. 3 (1991).  In this case, the claim was not presented to a

13 lower state court prior to the California Supreme Court; therefore, there is no reasoned state court

14 decision to review.  In such a case, "[w]here a state court's decision is unaccompanied by an

15 explanation, the habeas petitioner's burden still must be met by showing there was no reasonable

16 basis for the state court to deny relief."  Harrington v. Richter, ___ U.S. ___, 131 S.Ct. 770, 784,

17 2011 WL 148587 (2011).  "Federal habeas relief may not be granted for claims subject to §

18 2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then

19 clearly established in the holdings of this Court, § 2254(d)(1); Williams v. Taylor, 529 U.S. 362,

20 412 (2000); or that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it

21 "was based on an unreasonable determination of the facts" in light of the record before the state

22 court, § 2254(d)(2)."  Harrington, 131 S.Ct. at 785.

23       The law on insufficiency of the evidence claim is clearly established.  The United States

24 Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a

25 federal court must determine whether, viewing the evidence and the inferences to be drawn from

26 it in the light most favorable to the prosecution, any rational trier of fact could find the essential

27 elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

28 Sufficiency claims are judged by the elements defined by state law.  Id. at 324 n.16.

8

Petitioner was convicted of first degree murder.  In California, a first degree murder

conviction requires a finding that the defendant killed another person with malice aforethought,

and that the murder was perpetrated in a willful, deliberate, and premeditated manner. Cal. Penal

Code §§ 187, 189.  A defendant acts willfully when he intends to kill; deliberately if he carefully

weighed the considerations for and against his choice, and, knowing the consequences, decided

to kill; and with premeditation if he decides to kill before committing the act that causes death.

CALCRIM No. 521.  It is not necessary to prove the defendant maturely and meaningfully

reflected upon the gravity of his or her act. Cal. Penal Code § 189.

Here, there was ample evidence supporting the elements of first degree murder.  The

victim was shot in the head, and it was determined the gun was only six inches from her head

when she was shot.  (8 RT 1101.[3])  The gun had three safety features which needed to be

disengaged before the gun could fire.  (8 RT 1112-1113.)  The gun's trigger required

approximately 10 to 14 pounds of pressure to fire. (8 RT 1115.)  Petitioner admitted he took the

gun from his father's home ahead of time. (8 RT 1199.)  He stated he loaded the gun prior to

entering his apartment. (8 RT 1218.)  Petitioner admitted he shot the victim out of anger. (8 RT

1216-17.)  Based on these facts, the jury could reasonably have determined that Petitioner had the

intent to kill the victim and decided to kill her beforehand.  Petitioner fails to demonstrate that

the state court's decision was "contrary to, or involved an unreasonable application of, clearly

established Federal law," or an "unreasonable determination of the facts in light of the evidence,"

the claim should be rejected. 28 U.S.C. § 2254(d).

B.  Confession

Petitioner next contends his confession was false and involuntary.  He claims his

confession was coerced and cites to the following circumstances: 1) he claims detectives were

friendly, which "softened [him] up"; 2) he claims he was interrogated outside in the cold; 3) he

claims he was not given any food; and 4) he claims he had no experience dealing with the

---

[3]"8 RT" refers to the eighth volume of the Reporter's Transcript on Appeal.

1  criminal justice system.  He also claimed he was not read his <u>Miranda</u>[4] warnings immediately.

2    This claim was also presented by habeas petition to the California Supreme Court on

3  October 5, 2009.  As the California Supreme Court denied the petition without comment and

4  there is no reasoned decision by a lower state court, Petitioner must demonstrate that there was

5  no reasonable basis to deny relief and satisfy the provisions of 28 U.S.C. § 2254(d).  <u>Harrington</u>,

6  131 S.Ct. at 784-85.

7    The Fifth Amendment to the United States Constitution guarantees that no person shall be

8  compelled to give evidence against himself.  The Fourteenth Amendment to the Constitution

9  secures this same privilege against state infringement.  <u>Malloy v. Hogan</u>, 378 U.S. 1, 6 (1964).

10 The protection against self-incrimination is violated whenever a coerced confession is introduced

11 at trial. <u>New Jersey v. Portash</u>, 440 U.S. 450, 458-459 (1979).  In ascertaining whether a

12 confession was coerced in violation of the Constitution, the "inquiry is not whether the conduct

13 of state officers in obtaining the confession was shocking, but whether the confession was 'free

14 and voluntary; that is, (it) must not be extracted by any sort of threats or violence, nor obtained

15 by any direct or implied promises, however slight, nor by the exertion of any improper

16 influence.'" <u>Malloy</u>, 378 U.S. at 6, *quoting*, <u>Bram v. United States</u>, 168 U.S. 532, 542-43 (1897).

17 In <u>Schneckloth v. Bustamente</u>, 412 U.S. 218, 225-226 (1973), *quoting*, <u>Culombe v. Connecticut</u>,

18 367 U.S. 568, 602 (1961), the Supreme Court held:

19    'The ultimate test remains that which has been the only clearly established test in Anglo-
20    American courts for two hundred years: the test of voluntariness. Is the confession the
      product of an essentially free and unconstrained choice by its maker? If it is, if he has
21    willed to confess, it may be used against him. If it is not, if his will has been overborne
      and his capacity for self-determination critically impaired, the use of his confession
22    offends due process.'

23   The totality of the surrounding circumstances of a confession, including the

   characteristics of the suspect himself, must be assessed.  <u>Schneckloth</u>, 412 U.S. at 226.
24
   Examples of circumstances to be considered include: the length of the interrogation, <u>see</u> <u>Ashcraft</u>
25
   <u>v. State of Tennessee</u>, 322 U.S. 143 (1944) (a 36-hour continuous interrogation, without sleep or
26
   rest, rendered the resulting confession coerced); the failure to advise the suspect of his
27

28    [4]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

constitutional rights, see <u>Davis v. North Carolina</u>, 384 U.S. 737 (1966); lack of education, see <u>Payne v. Arkansas</u>, 356 U.S. 560 (1958); low intelligence, see <u>Fikes v. Alabama</u>, 352 U.S. 191 (1957); denial of food or medical attention resulting in physical pain, see <u>Reck v. Pate</u>, 367 U.S. 433 (1961).  In this case as shown below, the circumstances of Petitioner's confession did not violate his constitutional rights.

On December 16, 2006, at 3:07 a.m., Petitioner called 9-1-1 and reported that someone had entered his apartment, put a knife to his throat, went into a bedroom, and shot Petitioner's girlfriend. (8 RT 1183.)

At approximately 3:45 a.m., Petitioner was interviewed by Detectives Chris Fern and A. Rodriguez.  (7 RT 1037-38; 8 RT 1189-1220.)  Initially, the detectives asked several background questions of Petitioner such as his name, age, address, family, education, hobbies and sports.  (8 RT 1189-91.)  During this initial questioning, Petitioner stated he was cold. (8 RT 1189.) Detective Fern responded: "You cold? Would you like a jacket? You want to wear my jacket? I'm all right. I've got a long-sleeved shirt on. Go ahead and put my jacket on." (8 RT 1191.) The detectives at one point complemented Petitioner on his infant daughter. (8 RT 1190.)  Petitioner stated he was going to join the Marines to which Detective Rodriguez responded: "Cool. Good for you. Good for you." (8 RT 1191.) The detectives asked if Petitioner had eaten anything and if he was okay. (8 RT 1191.) Petitioner stated he hadn't eaten anything in a while. (8 RT 1191.) Detective Rodriguez replied, "For a while? But you're okay though?" (8 RT 1191.) Petitioner stated, "Yeah." (8 RT 1191.)

As soon as these preliminary questions were asked, the detectives read Petitioner his <u>Miranda</u> warnings. (8 RT 1192.)  Petitioner requested the questioning be done someplace warm, and the detectives began to make arrangements to conduct the interview in a warm location. (8 RT 1193.)  Petitioner asked them to read him his rights again, and the detectives complied. (8 RT 1193.)  He stated he understood his rights and agreed to speak with the detectives. (8 RT 1193-94.)  He first stated that the victim had gotten into a confrontation with two men at a crosswalk. (8 RT 1195.)  He stated he was worried for their safety so he took his father's gun from his parents' home. (8 RT 1196, 1199.) He then volunteered that he went in to see the victim and was

going to show her the gun when he shot and killed her. (8 RT 1197.)  He initially maintained it was an accident. The detectives told Petitioner they didn't believe it was an accident, and after further questioning, Petitioner admitted he shot the victim out of anger because she made a look of disgust. (8 RT 1216-17.)

Petitioner was transported downtown to police headquarters where he was questioned a second time. (8 RT 1139, 1225.)  Before he was questioned, he was told his child was fine and that she was in another room being cared for by officers. (8 RT 1225.)  He was also offered a soda. (8 RT 1225.)  Immediately after introductions and the above questions were had, the detectives asked Petitioner if he had been read his rights. (8 RT 1225.)  Petitioner admitted he had been twice read his rights by the first detective. (8 RT 1225.)  He stated he understood his rights and agreed to continue speaking to the detectives. (8 RT 1226.)  He again confessed to shooting the victim. (8 RT 1232.)  He stated he loaded the gun in his car by inserting the magazine and sliding a round into the chamber. (8 RT 1234-1235.)  He admitted he squeezed the trigger out of anger because the victim made a face at him. (8 RT 1232, 1244-1245, 1247-1248, 1250-1251, 1258.)

Petitioner contends the circumstances surrounding his confession prove it was coerced. Not so. Petitioner first alleges the detectives "softened him up" by acting friendly.  The Court is unaware of any Supreme Court authority where an officer building rapport with a suspect in a friendly manner would cause a resulting confession to be considered involuntary.  Petitioner states the detectives informed him that cooperation would be to his benefit, but their remarks were not threatening or coercive.  Such questioning certainly does not violate the Constitution. See, e.g., Fare v. Michael C., 442 U.S. 707, 727 (1979).  Petitioner also contends he was deprived of warmth when he was questioned outside after he had asked to go indoors.  It is true Petitioner stated he was cold; however, as noted above, he was provided a jacket for warmth which he apparently accepted while officers made arrangements for another location. Petitioner also complains that he was denied food.  During the interview, when Petitioner was asked about his well-being, he stated he had not eaten in a while.  When the detective asked whether Petitioner was okay despite not having eaten in some time, Petitioner stated, "Yeah." (8 RT

1191.)  Petitioner also alleges his lack of experience dealing with law enforcement compelled his

confession. The Court is unaware of any authority in which a lack of experience would render a

confession involuntary.  Circumstances such as the individual's age, intelligence and education

are relevant, but none of these factors were present in Petitioner's case.  Indeed, nothing in

Petitioner's questioning could be called coercive.  The detectives who questioned Petitioner were

polite and courteous.  Although they expressed disbelief in Petitioner's story, they did not

threaten Petitioner.  They expressed concern for Petitioner's well-being on multiple occasions.

The first detective offered Petitioner a jacket for warmth. Petitioner was also given a soda for

drink.  The officers also took Petitioner's child into their care and reassured him that the baby

was being properly cared for.

Finally, Petitioner complains he was not immediately given his <u>Miranda</u> warnings.  The

transcript of the hearing shows Petitioner was asked some initial questions about his well-being

and introductions were made before he was read his <u>Miranda</u> rights.  There is no clearly

established Supreme Court authority which holds that a suspect must immediately be read his

rights before any questions may be asked.  If a suspect makes incriminating remarks after being

taken into custody and interrogated, those remarks would not be admissible under the

Constitution.  In this case, none of Petitioner's incriminating remarks occurred prior to his

receiving his <u>Miranda</u> warnings.  As to the warnings themselves, Petitioner was twice read his

rights, and he stated he understood them and agreed to answer the questions of the detectives.

Given all of the facts, Petitioner has not shown his confession to be coerced and

involuntary.  He fails to demonstrate that the state court's decision was "contrary to, or involved

an unreasonable application of, clearly established Federal law," or an "unreasonable

determination of the facts in light of the evidence." 28 U.S.C. § 2254(d). The claim should be

rejected.

C.   Ineffective Assistance of Trial Counsel

Petitioner next argues his trial counsel rendered ineffective assistance in the following

ways: 1) by failing to pursue further investigation of the victim's relatives as possible defense

witnesses; 2) by failing to request a retrial based on statements made by the victim's relatives; 3)

by failing to obtain an expert to challenge the prosecution expert's testimony regarding the path of the bullet; and 4) by eliciting testimony from Petitioner that he had been in custody since his arrest.

This claim was also presented by habeas petition to the California Supreme Court on October 5, 2009. Since the petition was denied without comment and there was no reasoned decision by a lower state court, Petitioner must demonstrate that there was no reasonable basis to deny relief and satisfy the standard set forth in 28 U.S.C. § 2254(d). Harrington, 131 S.Ct. at 784-85.

The law governing ineffective assistance of counsel claims is clearly established. Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.) In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland v. Washington, 466 U.S. 668, 687 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688. Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. 668, 687 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must demonstrate prejudice, that is, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different," 466 U.S. at 694. A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. 668, 697 (1984). Since the defendant must affirmatively

prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

The court must evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).

### 1. Failure to Investigate Witnesses

Petitioner first alleges defense counsel was ineffective by failing to contact and investigate the victim's father and grandmother prior to trial as possible defense witnesses. Petitioner notes comments made by the father and grandmother at sentencing. The father stated that the victim appeared happy to have a baby and looked as if she would get married. (13 RT 1909.) The grandmother stated that all the victim wanted was a close family life and that the victim was very happy when she had the baby. (13 RT 1906.) Petitioner argues that defense counsel should have presented this evidence to the jury since the prosecution had argued that the baby caused friction between Petitioner and the victim.

In presenting a claim of ineffective assistance based on counsel's failure to call witnesses, Petitioner must identify the witness, U.S. v. Murray, 751 F.2d 1528, 1535 (9th Cir. 1985), show that the witness was willing to testify, U.S. v. Harden, 846 F.2d 1229, 1231-32 (9th Cir. 1988), and show that the witness's testimony would have been sufficient to create a reasonable doubt as to guilt. Tinsley v. Borg, 895 F.2d 520, 532 (9th Cir. 1990); see also United States v. Berry, 814 F.2d 1406, 1409 (9th Cir. 1989) (holding that where defendant did not indicate what witness would have testified to and how such testimony would have changed the outcome of the trial, there can be no ineffective assistance of counsel). The absence of affidavits from uncalled witnesses puts a petitioner's claim at a disadvantage. Howard v. O'Sullivan, 185 F.3d 721, 724 (7th Cir. 1999) ("failure to submit supporting affidavits from [the] potential witnesses would severely hobble [the petitioner's] case.")

In this case, Petitioner fails to demonstrate that the witnesses were willing to testify on behalf of the defense, or that their testimony would have been sufficient to cause a reasonable doubt as to guilt. The witnesses had nothing to offer regarding the circumstances of the shooting, in particular whether it was accidental or intentional, since they were not present when it

occurred.  Likewise, they could not testify to Petitioner's state of mind during the shooting.  The only evidence Petitioner points to is evidence that the victim was happy to have a baby.  This evidence would have done nothing to undermine the prosecution's evidence that the couple argued regularly in the months preceding the shooting, or that the child caused friction between the couple.  Petitioner fails to demonstrate that counsel rendered ineffective assistance in failing to present this evidence to the jury, or that the evidence would have caused a reasonable doubt as to guilt.

### 2.  Failure to Request a Retrial

Petitioner also claims trial counsel should have requested a new trial based on the statements made by the father and grandmother during sentencing.  Assuming, as Respondent does, that Petitioner's grounds for new trial would have been newly discovered evidence pursuant to Cal. Penal Code § 1181(8), Petitioner's claim is meritless.

Pursuant to Cal. Penal Code § 1181(8), a new trial may be granted "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial."  In this case, as previously discussed, the evidence was not material as to any element of the offense.  In addition, the evidence could have been discovered and produced at trial with reasonable diligence.  Thus, there was no basis for such a motion, and counsel cannot be faulted for failing to bring a motion which would surely have been denied. See Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994) ("A lawyer's zeal on behalf of his client does not require him to file a motion which he knows to be meritless on the facts and the law.").

### 3.  Failure to Obtain an Expert

Petitioner also faults counsel for failing to secure expert testimony regarding the path of the bullet.  The prosecution argued that Petitioner stood over the victim while the victim was lying in bed when he intentionally shot her.  Petitioner argues that a ballistics expert would have testified, consistent with the pathologist, that the bullet that entered the victim's right eye traveled upward in her skull, thus supporting his version of the shooting that he was kneeling next to her and showing the gun to her when it accidentally went off.

As pointed out by Respondent, Petitioner's claim is without basis in fact.  The

pathologist, Dr. Venu Gopal, did not testify that the bullet traveled upward.  Rather, he testified that the "course and direction of the wound is from front to back and slightly right to left." (8 RT 1102.) When questioned further regarding the bullet's path, Dr. Gopal stated that the gun was on the same level as the victim's right eye. (8 RT 1102.)  On cross-examination, Dr. Gopal stated that the wound offered no evidence as to the positions of the victim and shooter, only the angle of the bullet as it entered the victim. (8 RT 1106.)  Therefore, as correctly argued by Respondent, Petitioner's argument is flawed.  The evidence did not show an upward trajectory.  The evidence could only show that the victim's head was on the same level as the gun when it was fired.  Thus, the evidence leaves open countless possibilities for the positions of the victim and shooter. Indeed, the evidence supported both the prosecution and the defense theories of the shooting. The prosecution argued that the victim was on the bed looking up at Petitioner who was standing with the gun pointed at the victim when he fired, and the defense argued that Petitioner kneeled beside the victim as she looked straight across at the gun when Petitioner fired.

Defense counsel cannot be faulted for failing to secure a ballistics expert because an expert would not have been able to offer anything further in support of the defense case.  Dr. Gopal testified that it was impossible to ascertain the positions of the victim based on the evidence.  Furthermore, Petitioner fails to offer anything to undermine Dr. Gopal's testimony. Therefore, he cannot demonstrate prejudice.  Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir. 1997) ("Speculation about what an expert could have said is not enough to establish prejudice.").


4.  Improper Elicitation of Petitioner's Custodial Status

Petitioner contends defense counsel rendered ineffective assistance by eliciting testimony from him that he had been in custody since his arrest.  He claims this evidence was prejudicial since the jury would have been led to believe Petitioner was denied bail because he was dangerous.

First, Petitioner fails to demonstrate that counsel's question regarding Petitioner's custodial status was an error so serious that counsel's representation fell below an objective standard of reasonableness.  Petitioner does not point to, and the Court is unaware of, any

authority which holds that defense counsel's elicitation of testimony regarding a defendant's custodial status constitutes ineffective assistance.  In this case, the record provides no specific reason for counsel's question; however, as noted by Respondent, Petitioner appeared at trial wearing jail clothing.  As Respondent points out, a reasonable explanation for counsel's question could have been that counsel wanted to avoid juror speculation that Petitioner was in custody for another crime prior to trial in the instant case.

In any case, Petitioner cannot demonstrate prejudice.  Petitioner was charged with murder.  Anyone charged with murder is likely to have bail set very high, and not all defendants can afford to post such bail.  If the jurors considered Petitioner's testimony at all, the most likely conclusion would have been that Petitioner simply could not make bail.  The chance that jurors would have concluded Petitioner was in custody since arrest because he was particularly dangerous is remote at best.

In this case, Petitioner cannot demonstrate error by defense counsel or any prejudice resulting therefrom.  Petitioner fails to demonstrate that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, or an unreasonable determination of the facts in light of the evidence.  28 U.S.C. §§ 2254(d)(1), (2). The claim should be denied.

D.   Ineffective Assistance of Appellate Counsel

Petitioner next argues his appellate counsel rendered ineffective assistance by failing to raise the above claims.

Claims of ineffective assistance of appellate counsel are reviewed according to Strickland's two-pronged test.  See Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986).  A defendant must therefore show that counsel's advice fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, defendant would have prevailed on appeal.  Miller, 882 F.2d at 1434 & n. 9, *citing* Strickland, 466 U.S. at 688, 694.  However, appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant.  Jones v. Barnes, 463 U.S. 745, 751-54 (1983); Miller, 882 F.2d at 1434 n. 10.

1   The weeding out of weaker issues is widely recognized as one of the hallmarks of effective

2   appellate advocacy.  Miller, 882 F.2d at 1434 (footnote and citations omitted).  As a result,

3   appellate counsel will frequently remain above an objective standard of competence and have

4   caused her client no prejudice for the same reason--because she declined to raise a weak issue.

5   Id.

6          In this case, appellate counsel did not render ineffective assistance.  None of the claims

7   previously discussed have any merit; therefore, counsel's decision not to raise them was

8   reasonable.  In addition, Petitioner cannot demonstrate prejudice, for even if appellate counsel

9   had raised the issues, there is little to no likelihood any of the claims would have been successful.

10  Petitioner's claim is without merit and should be denied.

11         E.   Trial Court's Failure to Instruct on Voluntary Manslaughter

12         In his last ground for relief, Petitioner claims the trial court erred by failing to *sua sponte*

13  instruct on the lesser included offense of voluntary manslaughter.  He argues the evidence

14  supported such an instruction based on the theory that Petitioner acted in the heat of passion.

15         Petitioner presented this claim on direct appeal to the Fifth DCA and California Supreme

16  Court.  Because the California Supreme Court's opinion is summary in nature, this Court "looks

17  through" that decision and presumes it adopted the reasoning of the California Court of Appeal,

18  the last state court to have issued a reasoned opinion.  See Ylst v. Nunnemaker, 501 U.S. 797,

19  804-05 & n.3 (1991) (establishing, on habeas review, "look through" presumption that higher

20  court agrees with lower court's reasoning where former affirms latter without discussion); see

21  also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts look to

22  last reasoned state court opinion in determining whether state court's rejection of petitioner's

23  claims was contrary to or an unreasonable application of federal law under 28 U.S.C. §

24  2254(d)(1)).

25         In denying Petitioner's claim, the appellate court stated as follows

26             Voluntary manslaughter is an intentional killing that lacks malice. (*People v.*
            *Breverman* (1998) 19 Cal.4th 142, 153.) A defendant lacks malice "'in limited, explicitly
27      defined circumstances,'" including "'when the defendant acts in a "sudden quarrel or heat
        of passion"....'" (*Id.* at pp. 153-154.) This form of voluntary manslaughter "is considered
28      a lesser necessarily included offense of intentional murder [citation]." (*Id.* at p. 154, fn.

omitted.)

[Petitioner] contends the evidence supports the heat of passion form of manslaughter and therefore the court's failure to instruct the jury on that offense was error. We disagree.

"[A] trial court must instruct the jury sua sponte on an uncharged offense that is lesser than, and included in, a greater offense with which the defendant is charged only if there is substantial evidence that, if accepted, would absolve the defendant from guilt of the greater offense but not the lesser." (*People v.. Waidla* (2000) 22 Cal.4th 690, 737, 94 Cal.Rptr.2d 396, 996 P.2d 46.) "'"Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." [Citation.]' [Citation.]" ( *People v. Cunningham* (2001) 25 Cal.4th 926, 1008.) This sua sponte duty exists even if the lesser offense is inconsistent with the theory of defense elected by the defendant or the defendant specifically requests that the jury not be instructed on lesser included offenses. (*People v. Breverman, supra,* 19 Cal.4th at pp. 154-155.)

"The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively." (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.) Thus, heat of passion, in this context, "'must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.'" (*Id.* at pp. 1252-1253.)

"To satisfy the objective or 'reasonable person' element of [heat of passion] voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.' [Citation.] However, ... 'there is no specific type of provocation required ... and ... verbal provocation may be sufficient.'" (*People v. Wickersham* (1982) 32 Cal.3d 307, 326, overruled on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 201.) Moreover, "provocation sufficient to reduce murder to manslaughter need not occur instantaneously, but may occur over time." (*People v. Wharton* (1991) 53 Cal.3d 522, 569.) Thus, "provocation can arise as a result of a series of events over time...." (*People v. Kanawyer* (2003) 113 Cal.App.4th 1233, 1245.) Furthermore, where "'sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter....'" (*People v. Breverman, supra,* 19 Cal.4th at p. 163.)

In *People v. Lucas* (1997) 55 Cal.App.4th 721, the defendant was convicted of second degree murder based on evidence that, while riding in a car with two companions, he shot and killed the driver of another car. The defendant testified that the victim laughed; a backseat passenger in the victim's car "'smirked' and looked at him 'real dirty, like he wanted to fight or something'"; and other "occupants of the [victim's] car 'were yelling out names, telling them to pull over.'" (*Id.* at p. 739.) The trial court refused the defendant's request for a jury instruction on heat of passion voluntary manslaughter. The defendant, on appeal "urge[d] error in that a juror could reasonably have found he intentionally shot the gun due to a 'sudden quarrel' arising from occupants of the [other] car having smirked and given him dirty looks." (*Ibid.*) In rejecting this argument, the Court of Appeal held: "jurors ... could not have rationally found that a *reasonable person* in the circumstances would have been provoked to shoot-certainly without evidence of what provocative 'names' the car's occupants may have been yelling [citation]." (*Ibid.*)

20

The conduct of the occupants of the other car "could not be deemed enough, on this evidence, to provoke a reasonable person to shoot someone." (*Id.* at p. 740.)

A look of disgust, like the combination of "dirty looks" and name calling in *Lucas,* cannot be deemed provocation sufficient to provoke an ordinarily reasonable person to shoot someone.

[Petitioner] concedes that a single look of disgust "may not suffice," but, relying on the principle that provocation may occur over a period of time, argues that when the way Israelsky looked at [Petitioner] is "considered along with and as a critical part of the ongoing verbal abuse and insults [Petitioner] suffered, the jury very well could have determined that it was this final insult that put [Petitioner] over the edge and caused him to act in the heat of passion ." We disagree.

Presumably, by "ongoing verbal abuse and insults" [Petitioner] means the following statements that, according to accounts [Petitioner] gave to police, Israelsky made and which came "flooding back" to [Petitioner] just before he shot her: Israelsky wished she had not gotten pregnant because as a result of getting pregnant she was "stuck with [[Petitioner]]"; she wished [Petitioner] had "never signed the birth certificate"; she wished she had never met [Petitioner]; and "if you don't like things then you can leave."

However, according to [Petitioner]'s accounts to police, Israelsky made the last of these statements four days before the shooting and made the other statements "months" previously on one, or possibly two occasions. As indicated above, where "'sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter....'" (*People v. Breverman, supra,* 19 Cal.4th at p. 163.) This principle is not directly applicable here because the shooting followed the victim's "disgusted" look, the most recent claimed provocative act; nonetheless, the principle is instructive because it embodies the more general principle that for ordinarily reasonable persons, passions, although they run high in the immediate aftermath of the event that provoked them, cool over time. Although Israelsky's statements could be considered provocative, she made almost all of them months before the shooting and the most recent one four days before. In our view, the months-long interval between the bulk of these statements and the most recent one, and the four-day period following the most recent statement, would have provided, for the ordinarily reasonable person, sufficient time for passions to cool, so that a look which conveyed disgust would not have triggered in such a person the heat of passion necessary for voluntary manslaughter. (Compare *People v. Berry* (1976) 18 Cal.3d 509, 514 [sufficient provocation where over a two-week period preceding the homicide, the victim "*continually* provoked defendant with sexual taunts and incitements" (italics added) ].)

We conclude further that even if the failure to instruct on voluntary manslaughter was error, such error was harmless.

Such error is reversible only if "it appears, 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred [citation]." (*People v. Breverman, supra,* 19 Cal.4th at p. 178, citing *People v. Watson* (1956) 46 Cal.2d 818, 836, fn. omitted.)

Here the jury was instructed, in the language of CALCRIM No. 521, in relevant part as follows: "The Defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The Defendant acted willfully if he intended to kill. The Defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The Defendant acted with premeditation if he decided to kill before committing the

act that caused death. [¶] ... *A decision to kill made rashly, impulsively, or without careful consideration is not deliberate or premeditated* .... [¶] All other murders are of the second degree." (Italics added.)

The pattern instruction on heat of passion voluntary manslaughter provides, in relevant part, as follows: "The defendant killed someone ... in heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, *the defendant acted rashly and under the influence of intense emotion* that obscured (his/her) reasoning or judgment: [¶] AND [¶] 3. The provocation would have caused a person of average disposition *to act rashly and without due deliberation,* that is, from passion rather than judgment." (CALCRIM No. 570, italics added.)

Thus, given the court's instruction on first and second degree murder, the jury, in convicting [Petitioner] of first degree murder rather than second degree murder, implicitly found [Petitioner] acted with deliberation and premeditation and rejected the notion he acted "rashly, impulsively, or without careful consideration" (CALCRIM No. 521). (*People v. Hinton* (2006) 37 Cal.4th 839, 871 [on appeal we presume the jury understood and followed trial court's instructions].) And as indicated above, to convict of heat-of-passion voluntary manslaughter, a jury must conclude the accused "acted rashly" and "without due deliberation." (CALCRIM No. 570.) Under these circumstances, it is extremely unlikely, and certainly not reasonably probable, that the jury would have convicted [Petitioner] of heat of passion voluntary manslaughter had the court instructed on that offense.

(See Answer Ex. A.)

The state court rejection of Petitioner's claim was not unreasonable. First, the Supreme Court has not clearly established that due process requires giving a lesser included offense in a non-capital case. Therefore, the trial court's alleged failure to instruct on the lesser offense fails to present a federal question. Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir.1984). Nevertheless, a defendant is entitled to an instruction on his theory of defense. Id. Such is not the case here.

First, Petitioner did not request an instruction on the lesser included offense of voluntary manslaughter, and his theory of defense was not heat of passion. Rather, the defense theory was that the discharge of the weapon was completely accidental and resulted from Petitioner mishandling the weapon. The jury was appropriately instructed on this defense theory with the lesser included offense of involuntary manslaughter.

Second, as found by the appellate court, any statements by the victim that could be deemed provocative were made months before the shooting. The evidence was insufficient to support such an instruction, since no reasonable person would respond to the victim's "disgusted look" by killing the victim in a heat of passion under these circumstances. Thus, an instruction

on heat-of-passion voluntary manslaughter was not warranted.

Third, Petitioner denied he acted in a heat of passion at trial. Rather, he maintained that he never intended to shoot the victim, and the shooting was purely the result of negligent handling of the weapon. Likewise, defense counsel argued that Petitioner had been pressured into the statements he made during his confession to law enforcement by the detectives' leading questions. As Petitioner fails to demonstrate that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," or an "unreasonable determination of the facts in light of the evidence," the claim should be rejected. 28 U.S.C. § 2254(d).

## RECOMMENDATION

Accordingly, the Court HEREBY RECOMMENDS that this action be DENIED WITH PREJUDICE.

This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

**Dated:     March 8, 2011**                    **/s/ Sandra M. Snyder**
                                        UNITED STATES MAGISTRATE JUDGE